2024 IL App (2d) 230343
No. 2-23-0343
Opinion filed July 18, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 23-DT-145 |
| | ) | |
| MICHAEL A. PELLEGRINO, | ) | Honorable |
| | ) | Rene Cruz, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Schostok and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    The State appeals from an order of the circuit court of Kane County granting the motion of defendant, Michael A. Pellegrino, to quash his arrest for driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2022)) and to suppress evidence. We vacate the suppression order and remand for further proceedings on defendant's motion.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant was arrested for DUI on February 28, 2023. The arresting officer served defendant with notice of the statutory summary suspension of his driving privileges due to his refusal to submit to, or failure to complete, chemical testing to determine the level of alcohol or other drugs or intoxicating compounds in his breath, blood, urine, or other bodily substance. On

March 20, 2023, defendant filed a petition to rescind the statutory summary suspension. A hearing on the petition was held on April 14, 2023. Elgin police officer Cassie Wortman was the only witness. She testified that in the early morning of February 28, 2023, she was dispatched to a Shell gas station in connection with a report that a vehicle had hit a deer and was swerving in the road. When she arrived, she observed a parked white Cadillac Escalade. Wortman approached the driver's side of the vehicle. Neither her squad car's lights nor its siren was activated. She did not have her gun drawn when she approached. Wortman observed that the vehicle had an "excessive amount" of mud on its tires.

¶ 4    Defendant was seated in the driver's seat and was on the phone with someone. Wortman asked defendant to roll down his window. Defendant complied, and Wortman immediately observed that his eyes were "glassy" (or "glossy"[1]) and his speech was slurred. She also smelled "an odor of alcoholic beverage emitting from the vehicle and what appeared to be his person."

¶ 5    Wortman asked defendant if he "hit a deer or hit something." Defendant answered that "he didn't know what he hit." (However, on cross-examination by the State, Wortman testified that defendant stated that he "had no clue" whether he hit anything.) Wortman requested that defendant give her the keys to the vehicle. According to her, its engine was still running at that point. Wortman acknowledged that, when defendant surrendered his keys, he was not free to leave. At some point during their conversation, defendant told Wortman that he had consumed three vodka and sodas. Wortman asked defendant where he was coming from. He replied, "outer space." She then asked where he was going. He replied that he was going to Pluto.

---

[1]Wortman used both terms to describe defendant's eyes and, when asked, said that she did not consider there to be a difference between the two descriptors.

¶ 6    Wortman asked defendant to step out of the vehicle so that she could conduct field sobriety tests. Defendant advised her that one of his legs was paralyzed, so she did not have him perform the one-leg-stand and the walk-and-turn tests. However, she administered the horizontal gaze nystagmus test, during which she looked for six clues indicative of the consumption of alcohol. She observed all six. Based on her observations, she placed defendant under arrest for DUI.

¶ 7    Wortman wore a body camera, which recorded her encounter with defendant. The recording was admitted into evidence and played during the hearing. As pertinent here, the recording shows Wortman approach defendant's vehicle and knock on the driver's side window. The sound of the vehicle's running engine is audible on the recording. As defendant rolled down the window, he was conversing on his phone with a woman. Defendant said, "Let me call you back." The woman replied, "Okay, I'm getting dressed." Wortman asked defendant how he was doing. He responded that he was alright. She then asked him if he hit a deer. When defendant hesitated in responding, she asked, "Did you hit something?" After several seconds, defendant turned off his vehicle's engine and replied, "I have no clue." Wortman asked defendant if he knew where he was. Defendant responded, "Yeah," while quietly chuckling. Wortman then asked, "Do you got [*sic*] your keys on you?" Defendant said that he did. Wortman asked, "Can I see them real quick?" Defendant handed her the keys, commenting, "Wow, we're there?" Wortman did not return the keys to defendant.

¶ 8    The trial court granted defendant's petition to rescind the statutory summary suspension. Citing *People v. Bailey*, 2019 IL App (3d) 180396, the trial court concluded that Wortman's taking defendant's keys was an arrest, yet, at that point, Wortman lacked probable cause to arrest defendant for DUI. The court stated:

"[T]he question that lingers in the Court's mind is what observations did [Wortman] make prior to [seizing defendant's keys]. There is very limited conversation that takes place. I'm not sure if she's able to—if she sees the glassy eyes at that point or if that comes later. I don't know. The speech is delayed. I can't describe that as slurred. I didn't hear testimony as to what were the slurred words that she thought she observed.

She says odor of alcohol coming from his breath which is, again, sometimes unusual. Usually when they're still in the vehicle, it's coming from inside the vehicle. Then we confirm it when the person is out of the vehicle."

¶ 9    On May 25, 2023, defendant filed a motion to quash his arrest and suppress the evidence collected as a result of the arrest. Consistent with the trial court's ruling on the petition to rescind the statutory summary suspension, defendant argued that he was under arrest when Wortman seized his keys, but, at that point, there was no probable cause for the arrest. At the hearing on the motion, at defendant's request, the trial court took judicial notice of the transcript of the hearing on the petition to rescind. Defendant presented no other evidence. The State called Wortman as a witness. As pertinent here, she testified that when she encountered defendant, his vehicle was parked near some propane tanks. When defendant turned off the vehicle's engine, she asked him for his keys. She did so out of concern for defendant's safety and her own. The vehicle's proximity to the propane tanks played a role in her decision to ask for defendant's keys.

¶ 10    The trial court granted the motion to suppress. The court adhered to its prior conclusion that defendant was under arrest when Wortman took his keys. Based on the distance of the propane tanks from defendant's vehicle, as shown in Wortman's body camera recording, the court concluded that officer safety considerations did not justify the seizing of defendant's keys. The court further concluded that the arrest was not supported by probable cause.

¶ 11    The State moved to reconsider the order granting the motion to suppress. In denying the State's motion, the trial court noted that, at the hearing on the petition to rescind the statutory summary suspension, Wortman testified that defendant's vehicle was still running when she asked defendant for his keys. The trial noted that "we now are all agreeing that that is incorrect." The court reiterated that the propane tanks did not pose a danger calling for the seizure of defendant's keys. The State filed a certificate of impairment and a timely notice of appeal.

¶ 12                                    II. ANALYSIS

¶ 13    As we have observed:

> "Motions to suppress are subject to a bifurcated standard of review. We defer to the trial court's findings of fact, reversing them only if they are against the manifest weight of the evidence. [Citation.] However, we review *de novo* the trial court's legal conclusion as to whether the evidence in question must be suppressed." *People v. McKelvy*, 2019 IL App (2d) 180630, ¶ 15.

¶ 14    We note that our deference to the trial court's findings of facts "is based on the recognition that the trial court is in a superior position to determine and weigh the witnesses' credibility, observe their demeanor, and resolve conflicts in their testimony." *People v. Montes*, 2020 IL App (2d) 180565, ¶ 31.

¶ 15    The trial court granted defendant's motion to suppress because Wortman's taking defendant's keys was an arrest, yet, at that point, she lacked probable cause for an arrest. As we have observed:

> "There are three tiers of police-citizen encounters: (1) an arrest of a citizen, which must be supported by probable cause; (2) a temporary investigatory seizure conducted pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), where an officer may conduct a brief, investigatory stop

of a citizen when the officer has a reasonable, articulable suspicion of criminal activity and such suspicion amounts to more than a mere 'hunch'; and (3) police-citizen encounters that are consensual, which involve no coercion or detention and do not implicate any fourth amendment [(U.S. Const., amend. IV)] interests." *People v. Bianca*, 2017 IL App (2d) 160608, ¶ 13.

¶ 16 There appears to be no dispute that no seizure occurred before Wortman took defendant's keys. Similarly, both parties agree that taking defendant's keys amounted to a seizure. The crux of the parties' dispute is whether the seizure was an arrest requiring probable cause (as the trial court concluded) or a *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)) requiring only a reasonable, articulable suspicion of criminal activity (as the State argues).

¶ 17 In concluding that Wortman arrested defendant when she took his keys, the trial court relied on *dictum* in the Third District's decision in *Bailey*. There, a police officer stopped the defendant for speeding and requested to have another officer join him at the scene. *Bailey*, 2019 IL App (3d) 180396, ¶¶ 4, 7. The officers asked the defendant to give them the keys to the vehicle, and he complied. *Id.* ¶ 9. The officers later saw cans of alcoholic beverages in the vehicle. *Id.* After the officers administered a series of nonstandardized tasks to the defendant and he refused to step out of the vehicle to perform standardized sobriety tests, the officers arrested the defendant for DUI, based on his performance of the tasks and other circumstances. *Id.* ¶ 10. The defendant moved to suppress evidence. *Id.* ¶ 3. The trial court granted the motion on the basis that " 'there was no probable cause to arrest the defendant at the time [the officers] took the keys from him.' " *Id.* ¶ 16.

¶ 18 On appeal, the State argued that the officers had probable cause to arrest the defendant, based on facts that became known after they seized his keys. *Id.* ¶ 21. The *Bailey* court observed that the State's argument assumed that the defendant was not under arrest when the officers took

his keys. *Id.* ¶ 22. According to the *Bailey* court, the State's assumption was contrary to the trial court's ruling that the defendant was under arrest from the moment his keys were taken. *Id.* The *Bailey* court concluded that the State forfeited any argument that taking the defendant's keys was not an arrest or, alternatively, that probable cause to arrest existed before the defendant's keys were taken. *Id.* Although the court could have affirmed the trial court's judgment solely based on the State's forfeiture, the court added that, even if the State had preserved those arguments, they would have been unavailing because, "[f]or purposes of the fourth amendment, an individual is 'seized' when an officer ' "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." ' " *Id.* ¶ 23 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991), quoting *Terry*, 392 U.S. at 19 n.16).

¶ 19 The glaring flaw in the *Bailey* court's reasoning is that it apparently equated any "seizure" with an "arrest" requiring probable cause. The *Bailey* court overlooked that seizures also include *Terry* stops, which require only a showing of a reasonable suspicion of criminal activity. Using physical force or a show of authority does not differentiate an arrest from a *Terry* stop. *People v. Walters*, 256 Ill. App. 3d 231, 237 (1994). Rather, in determining whether a seizure is an arrest, courts consider various factors, such as "the drawing of a police officer's weapon, the tone of voice, the use of handcuffs, physical touching, and the threatening presence of several officers." *Id.* However, even handcuffing the subject of a *Terry* stop and placing that subject in a squad car does not necessarily transform the stop into an arrest. *Id.* "Since the facts of each case differ, *** the permissible bounds of [a *Terry*] stop must be flexible enough to take the least intrusive measures necessary within the dictates of reasonable prudence to maintain the *status quo*." *Id.* As we observed in *Walters*, " '[i]t would be paradoxical to give police the authority to detain pursuant

to [a *Terry*] stop yet deny them the use of force that may be necessary to effectuate the detention.' " *Id.* (quoting *People v. Starks*, 190 Ill. App. 3d 503, 509 (1989)).

¶ 20    Mindful of these principles, we conclude that, although a seizure might have occurred when Wortman took defendant's keys (and the State has conceded that one did), that seizure was merely a *Terry* stop rather than an arrest. Wortman did not draw her weapon, use a threatening tone of voice, place defendant in handcuffs, or touch him, and, at the time she took defendant's keys, she was the only officer at the scene. Taking defendant's keys to prevent him from driving away was minimally intrusive. We note that courts in sister states have likewise concluded that merely taking a motorist's keys does not amount to an arrest requiring probable cause. See *State v. Whittington*, 401 S.W.3d 263, 273-75 (Tex. Ct. App. 2013) (although taking keys from motorist suspected of driving while intoxicated was an additional restraint on her liberty, it did not transform a proper investigative detention into an arrest; "[d]uring an investigatory detention, officers are permitted to use reasonably necessary force to maintain the status quo, effectuate an investigation, or protect the safety of individuals at the scene"); *State v. Barriger*, 239 P.3d 1290, 1294 (Kan. Ct. App. 2010) (where trooper who encountered the defendant's parked vehicle partially blocking traffic had a reasonable suspicion that the defendant was under the influence, trooper's act of taking the vehicle's keys for the legitimate purpose of transporting it and the defendant to a location where field sobriety tests could be performed safely did not convert the encounter into an arrest; "a person is seized (*i.e.*, is not free to leave) whether the situation is an investigatory detention or an arrest," and the trooper "did not use handcuffs, draw a weapon, or force compliance in any physical way"); *Texas Department of Public Safety v. Vasquez*, 225 S.W.3d 47, 54 n.2 (Tex. Ct. App. 2005) (noting that, even if the officer had immediately removed the vehicle's keys upon making contact with the driver stopped for suspected driving while intoxicated, that action alone would not have

transformed the encounter into a stop but would have been "a reasonable safety measure," given that the vehicle was stopped along a busy freeway and there were two passengers); *State v. Smith*, 644 N.E.2d 712, 713-14 (Ohio Ct. App. 1994) (the defendant, who had been asleep in vehicle with the engine running, was not under arrest when the officer asked him to turn off the engine and took his keys; the officer took the keys incident to administering coordination tests after noticing a smell of alcohol inside the vehicle and that the defendant's eyes were glassy).

¶ 21    Because the seizure that occurred here was a *Terry* stop, the relevant question is whether Wortman had a reasonable, articulable suspicion that defendant had been driving under the influence of alcohol. *People v. Carlson*, 307 Ill. App. 3d 77 (1999), is instructive. In *Carlson*, a sheriff's deputy encountered a vehicle parked alongside the road and found the defendant apparently unconscious in the driver's seat. *Id.* at 79. The deputy tapped on the window, and the defendant awakened and moved his hand "as if to smoke a cigarette that was not there." *Id.* When the defendant rolled down the window, the deputy "immediately detected a strong odor of alcohol." *Id.* "[A]t that point"—the *Carlson* court held—the deputy had a reasonable suspicion that the defendant had been driving under the influence of alcohol, and thus, the deputy "was justified in asking the defendant to step outside for a further investigation." *Id.* at 81.

¶ 22    Like the deputy in *Carlson*, in this case, Wortman testified that, when defendant rolled down his window, she smelled the strong odor of an alcoholic beverage. Although defendant was conscious when Wortman first encountered him, he was slow to respond to her inquiry about whether he had hit a deer or something else with his vehicle. According to Wortman's testimony at the suppression hearing, defendant "looked around as if he was confused" before responding that he had "no clue." The body camera recording of Wortman's encounter with defendant shows him exhibiting what can fairly be described as a "blank" or "vacant" facial expression, suggestive

of impairment from alcohol. Moreover, Wortman testified that defendant's eyes were "glassy," which would also contribute to a reasonable suspicion that defendant was under the influence of alcohol.

¶ 23    Assuming it was truthful, Wortman's testimony about the odor of alcohol and the appearance of defendant's eyes, along with circumstances apparent from the body camera recording, was sufficient to establish a reasonable suspicion that defendant was driving under the influence of alcohol, and, thus, to justify a *Terry* stop. However, the trial court did not make any findings regarding the credibility of Wortman's testimony because it erroneously concluded that taking defendant's keys amounted to an arrest. It is not our role to assess a witness's credibility. Likewise, it is not our obligation to make factual findings based on video recordings. These responsibilities belong to the trial court. See *People v. Hughes*, 2015 IL 117242, ¶¶ 28, 46 ("The dissenting justice concluded the majority had, by reviewing the interrogation and confessions *de novo*, wandered into fact finding, 'a function incompatible with any recognized standard of review.' " (quoting *People v. Hughes*, 2013 IL App (1st) 110237, ¶ 97 (Mason, J., dissenting) and citing *Hughes*, 2013 IL App (1st) 110237, ¶ 117 (Mason, J., dissenting))). Accordingly, on remand, the trial court shall (1) vacate the order granting defendant's motion to suppress, (2) make findings regarding Officer Wortman's testimony and findings regarding the contents of the body camera recording, and (3) enter a new order consistent with those findings and the principles set forth herein.

¶ 24                                  III. CONCLUSION

¶ 25    For the reasons stated, we vacate the order of the circuit court of Kane County, granting defendant's motion to suppress evidence, and we remand for further proceedings consistent with this opinion.

¶ 26    Vacated and remanded.

---

*People v. Pellegrino*, **2024 IL App (2d) 230343**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 23-DT-145; the Hon. Rene Cruz, Judge, presiding. |
| **Attorneys for Appellant:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Pamela S. Wells, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | Liam Dixon, of Law Office of Liam Dixon, LLC, of Aurora, for appellee. |